IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 06–cv–01144–EWN–BNB

ROBERT SAIZ, Individually, and,
BRIGHTON SANTA-FE INC., d/b/a
Brighton Depot, Inc., a Colorado
corporation,

    Plaintiffs,

v.

CHARTER OAK FIRE INSURANCE Co., a
Connecticut corporation,

    Defendant.

_____

**ORDER AND MEMORANDUM OF DECISION**
_____

This is an insurance case. Plaintiffs Robert Saiz and Brighton Santa-Fe, Inc., d/b/a Brighton Depot, Inc. ("Brighton Depot"), assert that Defendant Charter Oak Fire Insurance Company breached an insurance contract and acted in bad faith by failing to cover certain property. This matter comes before the court on "Defendant's Motion for Summary Judgment," filed December 15, 2006. Jurisdiction is premised on diversity of citizenship pursuant to 28 U.S.C.A. § 1332 (West 2007).

**FACTS**

*1.     Factual Background*

Plaintiff Saiz was the sole owner of Brighton Depot, a restaurant that is no longer in business. (First Am. Compl. and Jury Demand ¶¶ 1–2 [filed Nov. 3, 2006] [hereinafter "Am. Compl."].) In August 2002, Plaintiff Saiz listed the Brighton Depot restaurant for sale. (Br. in Supp. of Mot. for Summ. J., Statement of Undisputed Material Facts ¶ 9 [filed Dec. 15, 2006] [hereinafter "Def.'s Br."]; *admitted at* Pls.' Resp. to Def.'s Mot. for Summ. J., Resp. to Statement of Additional Facts ¶ 9 [filed Jan. 19, 2007] [hereinafter "Pls.' Resp."].) In July 2004, Plaintiff Saiz ceased operations at Brighton Depot and closed the restaurant. (*Id*., Statement of Undisputed Material Facts ¶ 10; *admitted at* Pls.' Resp., Resp. to Statement of Additional Facts ¶ 10.) After closing the restaurant, Plaintiff Saiz retained "kitchen equipment, dishes, tables, chairs, etc. [sic]" in the building. (*Id*., Statement of Undisputed Material Facts ¶ 11; *admitted at* Pls.' Resp., Resp. to Statement of Additional Facts ¶ 11.) Additionally, Plaintiff Saiz maintained an office in the basement and continued to receive utility services in the building, including electricity, heat, and phone services. (Am. Compl. ¶¶ 8–9.) Plaintiff Saiz used the office to work on selling the Brighton Depot building and on other restaurant projects located in Santa Fe, New Mexico. (Def.'s Br., Statement of Undisputed Material Facts ¶ 11; *admitted at* Pls.' Resp., Resp. to Statement of Additional Facts ¶ 11.)

    *a.     The Incident Underlying Plaintiffs' Claim*

On December 1, 2004, Plaintiff Saiz learned that a sprinkler activation in the Brighton Depot building had triggered an alarm and the restaurant building had sustained damage. (Am.

Compl. ¶¶ 10–11, 13.) At the time of the loss, Plaintiffs were insured under a business owners' policy (the "Policy") issued by Defendant. (*Id.* ¶ 16.) The Policy provided that Defendant would "pay for direct physical loss of or damage to [c]overed [p]roperty at the premises described . . . caused by or resulting from a [c]overed [c]ause of [l]oss." (Def.'s Br., Statement of Undisputed Material Facts ¶ 7; *admitted at* Pls.' Resp., Resp. to Statement of Additional Facts ¶ 7.) As is particularly relevant in the instant case, the Policy imposed certain limitations on coverage, including a limitation not to "pay for any loss or damage" caused by vandalism or water damage "even if they are a [c]overed [c]auses [sic] of [l]oss if the building where the loss or damage occurs has been 'vacant' for more than [sixty] consecutive days before that loss or damage occurs." (*Id.*) Under the Policy, a property is deemed "vacant" unless thirty-one percent of total square footage of the entire building is either "[r]ented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations" or "[u]sed by the building owner to conduct customary operations." (*Id.*, Statement of Undisputed Material Facts ¶ 8; *admitted at* Pls.' Resp., Resp. to Statement of Additional Facts ¶ 8.)

### b.     *Plaintiffs' Claim*

Promptly after learning of the damage, Plaintiff Saiz notified Defendant of a potential claim. (Am. Compl. ¶ 15.) On December 2, 2004, Plaintiff Saiz met with one of Defendant's representatives at the damage site. (*Id.*) Plaintiff Saiz told Defendant's representative that the heat in the building was turned off upstairs. (Def.'s Br., Statement of Undisputed Material Facts ¶ 30; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Additional Facts ¶ 30.)

On December 20, 2004, Defendant sent a letter to Plaintiff Saiz denying coverage for the loss, reasoning that the building was vacant and unheated, which allowed pipes to freeze and burst, causing the leak. (*Id.*, Statement of Undisputed Material Facts ¶ 17; *admitted at* Pls.' Resp., Resp. to Statement of Additional Facts ¶ 17.) Plaintiff Saiz subsequently retained a company, Sentry Fire and Safety ("Sentry"), to perform an investigation as to the cause of the damage. (Am. Compl. ¶ 14.) Sentry determined that the source of the water flow was a malfunctioning sprinkler head in the building's attic. (*Id.*) Sentry determined further that the cause of the malfunction was unknown. (*Id.*) In response to Defendant's letter denying coverage, Plaintiff Saiz stated that he had maintained heating services in the building and Sentry had determined the cause of the sprinkler head failure, while unknown, was not frozen pipes. (Def.'s Br., Statement of Undisputed Material Facts ¶ 18; *admitted at* Pls.' Resp., Resp. to Statement of Additional Facts ¶ 18.) Further, Plaintiff Saiz explained that he maintained his offices in the building and was present "most days of the week." (Am. Compl. ¶ 19.)

On December 30, 2004, Plaintiff Saiz administratively dissolved Brighton Depot. (Def.'s Br., Statement of Undisputed Material Facts ¶ 19; *admitted at* Pls.' Resp., Resp. to Statement of Additional Facts ¶ 19.) On January 21, 2005, Defendant sent a letter to Plaintiff Saiz stating it had reopened its investigation of the claim as to the cause of the sprinkler malfunction. (*Id.*, Statement of Undisputed Material Facts ¶ 20; *admitted at* Pls.' Resp., Resp. to Statement of Additional Facts ¶ 20.) In connection with its investigation, Defendant requested a second inspection of the site and copies of work orders or receipts for repairs made to the sprinkler head since the malfunction. (Am. Compl. ¶ 20.) Plaintiffs complied. (*Id.* ¶ 21.) Additionally,

Defendant retained a third party, Knott Laboratory ("Knott"), to investigate the cause of the damage. (Def.'s Br., Statement of Undisputed Material Facts ¶ 21; *admitted at* Pls.' Resp., Resp. to Statement of Additional Facts ¶ 21.) Knott opined that "the cause of the failure of the subject sprinkler head was from deliberate tampering that required a series of actions to effect the observed damages." (*Id.*, Statement of Undisputed Material Facts ¶ 27; *admitted at* Pls.' Resp., Resp. to Statement of Additional Facts ¶ 27.) As Plaintiffs put it, Knott determined that the malfunctioning sprinkler head had been tampered with, "but was unable to determine if the alleged tampering was performed prior to or after installation in the structure, or whom [sic] may have done the tampering." (Am. Compl. ¶ 21.) Finally, on April 28, 2005, Defendant interviewed Plaintiff Saiz under oath in connection with the investigation. (Def.'s Br., Statement of Undisputed Material Facts ¶ 22; *admitted at* Pls.' Resp., Resp. to Statement of Additional Facts ¶ 22.)

On July 25, 2005, Defendant issued its decision that it would not provide coverage, because the building was vacant and the sprinkler head had been vandalized and caused water damage.[1] (Am. Compl. ¶ 24.)

---

[1] The court notes that neither party has presented the court with the final denial of coverage. (*See* Def.'s Br.; Pls.' Resp.) One of Defendant's representatives testified that the claim was denied because "the building was vacant[] and there was water damage," giving rise to "exclusions [sic] under the [P]olicy." (Pls.' Resp., Ex. 2 at 50–51 [Barron Dep.].) The representative testified that Defendant did not deny the claim based on vandalism and that vandalism was a "nonissue." (*Id.*, Ex. 2 at 51–53 [Barron Dep].) Construing the facts in a light most favorable to Plaintiffs, as it must, the court assumes that Defendant supported its denial with both vandalism and water damage.

## *2.* *Procedural History*

On May 12, 2006, Plaintiffs filed a complaint in the District Court for the City and County of Denver, asserting claims for breach of contract and bad faith breach against Defendant. (Notice of Removal, Ex. A [Compl. and Jury Demand] [filed June 15, 2006].)  On June 15, 2006, Defendant removed the case to this court.  (*Id.*)  On September 18, 2006, Plaintiffs moved to amend their complaint to add a claim for punitive damages.  (Pls.' Mot. for Leave to File First Am. Compl. [filed Sept. 18, 2006].)  The magistrate judge granted the motion and Plaintiffs filed their amended complaint on November 3, 2006.  (Order [filed Nov. 3, 2006]; Am. Compl.)  On November 13, 2006, Defendant objected to the magistrate's order.  (Def. Charter Oak Fire Ins. Co.'s Obj. Pursuant to F.R.C.P. [sic] Rule 72[a] to Magistrate's Order of Nov. 3, 2006 [filed Nov. 13, 2006].)  This court's order concerning Defendant's objection is filed concurrently herewith under separate cover.

On December 15, 2006, Defendant filed a motion for summary judgment, in which it argues Plaintiffs' claims must fail because: (1) by its express terms, the Policy does not provide for coverage; and (2) Plaintiff Saiz has no standing in his individual capacity to file a claim concerning this subject matter.  (Def.'s Br.)  On January 19, 2007, Plaintiffs responded to the motion.  (Pls.' Resp.)  On February 5, 2007, Defendant filed a reply in support of its motion. (Reply Br. in Supp. of Mot. for Summ. J. [filed Feb. 5, 2007] [hereinafter "Def.'s Reply"].)

**ANALYSIS**

*1.     Legal Standard*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2007); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e) (2007). A fact in dispute is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248). The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985). The factual record and reasonable inferences therefrom are viewed

in the light most favorable to the party opposing summary judgment. *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

### *2.      Evaluation of Claims*

Defendant argues it is entitled to summary judgment because, under the only reasonable interpretation of the Policy, Plaintiffs are not due coverage. (Def.'s Br.) Defendant maintains that coverage is vitiated because: (1) the restaurant building was "vacant" under the terms of the Policy; (2) the damage sustained was "water damage;" and (3) the malfunctioning sprinkler head was vandalized. (*Id.* at 12–17.) Further, Defendant argues that because it did not breach the Policy, it could not have committed a bad faith breach, and Plaintiffs' claim therefor must fail.[2] (*Id.* at 17–19.) Plaintiffs counter that the building was not vacant, the Policy is ambiguous, and Defendant has failed to establish that the water damage was caused by vandalism. (Pls.' Resp. at 12–19.)

Contract interpretation is "a question of law to be resolved by the court." *Denver Ctr. for the Performing Arts v. Briggs*, 696 P.2d 299, 306 (Colo. 1985). "The primary goal of contract interpretation is to determine and give effect to the intention of the parties." *USI Props. East, Inc. v. Simpson*, 938 P.2d 168, 173 (Colo. 1997). In construing contract language, a court "should not rewrite the provisions of an unambiguous document, but must enforce an unambiguous contract in accordance with the plain and ordinary meaning of its terms." *Id.*

---

[2]As an alternative, Defendant argues Plaintiff Saiz has no individual standing to bring a claim against it. (Def.'s Br. at 19–21.) As will be seen, no further discussion of this argument is warranted.

"Whether . . . a contract is ambiguous is also a question of law for the court." *Denver Ctr. for the Performing Arts*, 626 P.2d at 306. "In ascertaining whether certain provisions of a document are ambiguous, the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words employed . . . and [t]he plain effect of a contract should not be destroyed by strained construction." *Bennett v. Coors Brewing Co.*, 189 F.3d 1221, 1232 (10th Cir. 1999). The mere fact "'that the parties disagree as to the meaning of the terms of the contract does not lead necessarily to the conclusion that the contract is ambiguous.'" *Id.* (quoting *Denver Ctr. for the Performing Arts*, 626 P.2d at 306). With this framework in mind, the court turns to the parties' arguments.

### a. Breach of Contract

The parties' dispute over whether a breach occurred evidently boils down to the questions of whether: (1) the restaurant building was vacant; (2) the damage was caused by water damage, vandalism, or sprinkler leakage; and (3) if it was caused by sprinkler leakage, whether an ambiguity exists as to the possibility of coverage. (*See* Def.'s Br.; Pls.' Resp.) The court addresses each issue in turn.

#### i. Vacancy

First, Defendant argues that the restaurant building was vacant under the Policy definition because less than thirty-one percent of the building was being used for customary operations. (Def.'s Br. at 12–17.) Plaintiffs' rambling response cannot be repeated in any concise manner. First, Plaintiffs concede that this is the definition of vacancy under the Policy, but assert that "the word 'operations,' as used in the phrase 'customary operations' is defined in the [P]olicy as

-9-

'business activities occurring at the described premises.'" (Pl.'s Resp. at 13.) Plaintiffs contend that, therefore, a building is vacant unless thirty-one percent of the building is being used "to conduct customary 'business operations.'" (*Id.*) Plaintiffs note that the Policy does not define the phrase "business activities [sic],"[3] and "therefore the phrase must be accorded its plain and ordinary meaning." (*Id.* at 13–14.) Plaintiffs then argue that the plain and ordinary meaning of the phrase "would encompass the activities conducted by [Plaintiff] Saiz on behalf of Brighton Depot following the closure of the restaurant." (*Id.* at 14.) Therefore, Plaintiffs argue, "the [P]olicy is at best ambiguous regarding whether the building in question was 'vacant at the time of the loss.'" (*Id.*)

Plaintiffs' tortured logic simply cannot stand. It is undisputed that under the Policy, Brighton Depot's business was identified as a "family style restaurant." (Def.'s Br., Statement of Undisputed Material Facts ¶ 4; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 4.) Plaintiff Saiz testified that the Brighton Depot premises were not "used for any other purpose other [sic] than operating the business, the restaurant business." (*Id.*, Ex. A–2 at 22 [Saiz Dep.].) Accordingly, by its plain and ordinary meaning, the phrase "customary business operations" in this case refers to the business of operating a restaurant.

It is undisputed that in July 2004, Plaintiffs "ceased operations and closed" the Brighton Depot restaurant. (*Id.*, Statement of Undisputed Material Facts ¶ 10; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 10.) Further, it is undisputed that Plaintiff

---

[3]The court assumes Plaintiffs actually refer to the phrase "business operations."

-10-

Saiz used the office to work on selling the Brighton Depot building and on other restaurant projects located outside of Colorado, not preparing and selling food or running a "family style restaurant." (*Id.*, Statement of Undisputed Material Facts ¶ 11; *admitted at* Pls.' Resp., Resp. to Statement of Additional Facts ¶ 11.) Accordingly, this court can come to no other conclusion than that the building was vacant because the premises were not being used for customary operations on December 1, 2004. Even if the court were to accept Plaintiffs' attenuated position that Plaintiff Saiz's use of the office sufficed as continuation of "customary operations," the court still finds that the building was vacant, because it is undisputed that the office comprised only ten to twelve percent of the total square footage of the Brighton Depot building — far less than the requisite thirty-one percent to escape being deemed "vacant." (*Id.*, Statement of Undisputed Material Facts ¶ 13; *admitted at* Pls.' Resp., Resp. to Statement of Additional Facts ¶ 13.) Given the facts of the case, the only logical conclusion is that on December 1, 2004, the Brighton Depot building was vacant under the plain meaning of the Policy language.

### ii.    *Policy Limitations*

The Policy states that Defendant will not provide coverage "if the building where the loss or damage occurs has been 'vacant' for more than [sixty] days before that loss or damage occurs" when the damage is caused by vandalism, water damage, or "[s]prinkler [l]eakage, unless [the insured has] protected the system against freezing." (*Id.*, Ex. A–1 ¶ A5e [Policy].) The court finds that because Plaintiffs admittedly ceased operating Brighton Depot as a restaurant in July

2004, the building had been vacant for more than sixty days on December 1, 2004.[4] (*Id.*, Statement of Undisputed Material Facts ¶ 10; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 10.) Thus, the Policy limitations appropriately may apply if the circumstances so warrant. The court now turns to those circumstances.

First, as to vandalism, Plaintiffs' only argument that the limitation should not apply is semantical to the point of being nonsensical. Plaintiffs assert that because the Policy does not define "vandalism," dictionary consultation is appropriate to understand the term. (Pls.' Resp. at 16.) The court agrees. *See Hecla Mining Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083, 1091 (Colo. 1991) ("When determining the plain and ordinary meaning of words, definitions in a recognized dictionary may be considered."). Plaintiffs cite the widely-recognized Black's law dictionary and Merriam-Webster's Collegiate Dictionary to establish that "vandalism" is defined as either "'willful or ignorant destruction of public or private property'" or "'willful or malicious destruction or defacement of public or private property.'" (Pls.' Resp. at 16.) Plaintiffs then turn to the Knott report, which indicates that "the cause of the failure of the subject sprinkler head was from deliberate tampering that required a series of actions to effect the observed damages." (Def.'s Br., Ex. A–9 at 5 [Knott Report].) Plaintiffs do not challenge the substantive findings of the Knott report, but instead underscore that the report "never used the term vandalism." (Pls.' Resp. at 17.) Plaintiffs' baffling argument evinces their need to spend a bit more time with their dictionaries.

---

[4] The same date and logic would apply if the court were to base its determination on Plaintiff Saiz's use of the basement office.

Any variance between "vandalism" and "deliberate tampering" is a mere distinction without a difference. "Deliberate" is defined as "characterized by or resulting from slow, careful, thorough calculation and consideration of effects or consequences: not hasty, rash, or thoughtless." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE, UNABRIDGED 596 (Philip Babcock Gove, Ph.D. ed., 1986). "To tamper" is defined as "to interfere so as to weaken or change for the worse." *Id.* at 2336. How slowly and carefully calculated interference so as to weaken or worsen could be characterized as anything other than purposeful destruction escapes this court — and Plaintiffs make no efforts to distinguish the notions. (*See* Pls.' Resp.) Given the facts as presented, the court finds that Plaintiffs have failed to raise an issue of fact concerning the applicability of the vandalism limitation.

As to water damage, Plaintiffs make no argument beyond two contentions: (1) the damage was caused by sprinkler leakage, which is covered under the Policy ; and (2) the Policy language is ambiguous. (*Id.* at 15.) The court will discuss Plaintiff's latter argument in a subsequent section of this Order and Memorandum of Decision. Concerning the former, Plaintiffs assert that the Policy cannot be interpreted to mean that the water damage limitation applies, because where "it is undisputed that the water damages results from 'sprinkler leakage' that is not caused by freezing of the system, the resulting water damage is covered by the Policy." (*Id.*) The court must disagree. First, Plaintiffs misstate the scope of coverage. The Policy excludes sprinkler leakage "unless [the insured has] protected the system against freezing." (Def.'s Br., Ex. A–1 ¶ A5e [Policy].) This is not the same as excluding all coverage on sprinkler leakage caused by freezing *or* covering all leakage that is not caused by freezing. That is to say, by the plain

language of the Policy, sprinkler leakage will be covered if the insured has protected the system against freezing. The cause of the leakage is not relevant, and the coverage will lie even if the leakage was caused by freezing.[5] The only issue relevant to the limitation is whether the insured has taken the requisite action. Here, Plaintiffs have not so much as even alleged they protected the system. (*See* Pls.' Resp.) Indeed, to the contrary, Plaintiff Saiz maintains that he had turned the heat system off in the upstairs portion of the Brighton Depot building, which is where the malfunctioning sprinkler was located. (Def.'s Br., Statement of Undisputed Material Facts ¶ 30; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Additional Facts ¶ 30.)

Further, Plaintiffs misstate the nature of the coverage for "sprinkler leakage." Additional reference to the dictionary aids the court's analysis. "To leak" is generally defined as "to enter or escape through a hole, crevice, or other opening, usually by a fault or mistake." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE, UNABRIDGED 1285 (Philip Babcock Gove, Ph.D. ed., 1986). Thus, by the plain meaning of the term, coverage for sprinkler leakage is for water accidently spilling forth from a sprinkler. Additionally, the court looks to a few cases discussing the meaning of "sprinkler leakage" in the insurance coverage context, the most instructive of which is an old case that Defendant proffers, *Carva Food Corp. v. Equitable*

---

[5] One can certainly envision the situation in which an insured had protected the system against freezing but, for example, unprecedented low temperatures or an undiscoverable pipe problem caused the system to freeze. The court recognizes its statement that "the cause of the leakage is not relevant" may be confusing if considered outside the context of the entire order. As will be seen, the term "sprinkler leakage" has specific meaning. The court's statement is not to be interpreted to mean that the cause of *any* water spilling from the sprinkler is not relevant. This interpretation would ignore the vandalism limitation, which the court is loath to do.

*Fire and Marine Insurance Co. of Providence, Rhode Island*, 261 F.2d 254 (4th Cir. 1958). (*See* Def.'s Br. at 14.) *Carva Food* involved construction and analysis of an insurance policy to determine whether sprinkler leakage caused by a windstorm warranted coverage. 261 F.2d at 254. In so construing and analyzing, the Fourth Circuit explained that sprinkler systems:

> diminished the risk of loss from fire, but [] created a new water hazard, for freezing water in the systems, heat short of fire, corrosion and other occurrences could cause a discharge of water within a building and upon its contents. This entirely new risk occasioned the need for a new type of insurance, which the sprinkler leakage coverage was designed to meet.

*Id.* at 257. This court finds that under the Policy, where water damage was undisputedly caused by a sprinkler malfunction caused by "deliberate tampering," coverage and limitations for sprinkler leakage — that is, coverage and limitations concerning freezing, corrosion, heat, and other causes for an *accidental or unintended* discharge[6] — are not applicable. (Def.'s Br., Ex. A–9 at 5 [Knott Report].) The court finds that Plaintiffs have failed to raise a genuine issue of fact to survive summary judgment because: (1) they have failed to show that leakage coverage or certain exceptions thereto ought be applicable in the instant case; or (2) if they have, Plaintiffs have failed to establish their attempts to protect the system from freezing (the condition precedent allowing for possible coverage).

---

[6]The court's proffered definition is further bolstered by Defendant's internal notes discussing leakage in the context of "breaking apart or cracking of a part of the [sprinkler] system." (Pls.' Resp., Ex. 6 at 2 [Notes].) It is therefore exceedingly difficult to imagine "leakage" as compatible with deliberate interference with and damaging of a sprinkler system. Plaintiffs make no effort to establish any such compatibility. (*See id.*, *passim.*)

Finally, the court briefly discusses water damage. Plaintiffs make no argument on the subject itself, but as Defendant underscores, Plaintiff Saiz initially notified Defendant of a "potential claim for *water damage* to the [Brighton Depot] structure." (Am. Compl. ¶ 15 [emphasis added].) Based on the foregoing, the court finds that Plaintiffs have not established a genuine issue of fact to show that the water damage and vandalism limitations do not apply or that any exception to the sprinkler leakage limitation is even appropriate for consideration.

### *iii.   Ambiguity*

In response to Defendant's competent arguments that the vandalism and water damage limitations exclude coverage under the Policy, Plaintiffs opaquely respond that:

> The [P]olicy language could be read to exclude coverage where a sprinkler system is vandalized, resulting in water damage. Alternatively, it could be read to mean that sprinkler leakage from a system protected against freezing is covered regardless of how the leakage takes place. Provided the leakage does not result from freezing, coverage would exist regardless of whether the sprinkler was vandalized.

(Pls.' Resp. at 16.) Evidently, Plaintiffs ignore the requirement that "[w]hen construing the language of an insurance contract, its provisions cannot be read in isolation, but must be considered as a whole." *Simon v. Shelter Gen. Ins. Co.*, 842 P.2d 236, 239 (Colo. 1992) (citation omitted). Given the express limitation in the Policy on coverage for vandalism, the latter interpretation that Plaintiffs set forth is simply nonsensical. (*See* Def.'s Br., Ex. A–1 ¶ A5e [Policy].) The notion that the act of protection from freezing should provide for coverage in the event of vandalism is exactly the sort of strained construction courts are instructed not to apply. *See Bennett*, 189 F.3d at 1232 (explaining that the "plain effect of a contract should not be

destroyed by strained construction"). The court finds no ambiguity. The vandalism and water damage limitations apply and defeat Plaintiffs' entitlement to coverage. Plaintiffs have not raised a genuine issue of fact supporting any other result. Accordingly, Defendant is entitled to summary judgment on Plaintiffs' claim for breach arising out of Defendant's refusal and failure to pay Plaintiffs' claim.

### b.   *Bad Faith Breach*

Colorado law expressly recognizes the tort of bad faith breach of an insurance contract. "The basis of the tort liability is the insurer's conduct in unreasonably refusing to pay a claim and failing to act in good faith." *Goodson v. Am. Standard Ins. Co. of Wisc.*, 89 P.3d 409, 414 (Colo. 2004). The court has already established that Defendant did not *unreasonably* refuse to pay Plaintiffs' claim, because there is no issue of fact to suggest that the water damage and vandalism limitations do not apply. (*See Analysis* § 2a, *supra*.)

Nonetheless, the court turns to Plaintiffs' bad faith allegations, which require only the shortest of schrift. First, Plaintiffs assert that Defendant knew or should have known its refusal to pay the claim was unreasonable because Defendant: (1) decided the Brighton Depot building was vacant, "[d]espite the fact that [Defendant] was advised by [Plaintiff] Saiz that his continued [sic] to conduct business activities at the restaurant on virtually a daily basis;" and (2) supported its denial with the vandalism limitation "even though to this day, not one individual has given it an opinion that the damage was due to vandalism." (Pls.' Resp. at 18.) The court's analysis above concerning vacancy and vandalism easily dispose of these grounds for Plaintiffs' claim. (*See*

*Analysis* § 2a, *supra.*) Because Defendant reasonably deemed the Brighton Depot building vacant and reasonably applied the vandalism limitation, neither point supports Plaintiffs' claim.

Plaintiffs next argue that Defendant "sent internal emails . . . evidencing that it was not acting in good faith with its insured, [sic] and that it was purposefully withholding information from its insured." (Pls.' Resp. at 18.) Plaintiffs cite *one* questionably intelligible email, which reads *in toto* as follows:

> Kris,
>
> This is the basis of Tim's voice mail to me regarding the response to my email:
>
> Better to keep short sweet to pint [sic] the more information we give out on this the more questions will [sic] get from insured [sic] and the more things can be twisted based on too much info from us.  Don't know [sic] if in the end we end up paying this thing don't want [sic] insured to know what we found, unless we are definitely take [sic] an EUO [sic] or deny this claim.  He [sic] doesn't think letting him [sic] know is a deterrent factor which [sic] he thinks the SIU [sic] approach.
>
> We have right [sic] to complete investigation in it's [sic] fullest and once EUO [sic] arranged the cat will be out of the bag when we start asking him and confronting him with the issue with the sprinkler head.  This is Tim's rationale by keeping it simple, rather than letting too much information out which sometimes makes things more difficult and he doesn't think we gain a lot.  He doesn't think the insured will walk just because SIU [sic] says head tampered [sic].
>
> Notes should reflect we are continuing to investigate and rule out the insured as to the COL [sic].

(Pls.' Resp., Ex. 7 [Email].)  Although it is difficult to decipher, the email expressly states that Defendant intended to make a complete investigation and might or might not pay Plaintiffs' claim. (*Id.*)  The court is at a loss as to what aspect of this email shows Defendant's bad faith, and, fatally to their argument, Plaintiffs do not go to the trouble to specify.  (*See id.* at 18.)

Finally, Plaintiffs argue — without citation to the record — that Defendant's representative admitted that "the company saved $62,000 by not paying [Plaintiffs'] claim, which demonstrates that it was favoring its financial interests over those of Brighton Depot." (*Id.* at 19.) Looking past Plaintiffs' problematic logic, the court notes that this unsubstantiated allegation is insufficient to survive summary judgment. *See L & M Enters. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1287 (10th Cir. 2000) (deeming conclusory and unsubstantiated allegations insufficient to create a genuine issue of fact to defeat summary judgment). This court has neither the desire nor the duty to substantiate Plaintiffs' claims for them. *See Desilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record."); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). Defendant is entitled to summary judgment on Plaintiffs' bad faith claim.

### 3. *Conclusion*

Based on the foregoing it is therefore ORDERED that:

1. Defendant's motion (# 45) is GRANTED.

2. The clerk shall forthwith enter judgment in favor of Defendant and against Plaintiffs, dismissing Plaintiffs' claims with prejudice. Defendant may have its costs by filing a bill of costs within eleven days of the date of this order.

Dated this 12th day of September 2007

                              BY THE COURT:

                              s/ Edward W. Nottingham
                              EDWARD W. NOTTINGHAM
                              Chief United States District Judge